LANDAU v. MUTUAL LIFE INS. CO. OF
NEW YORK.

Civ. A. No. 8280.

United States District Court
W. D. Pennsylvania.

Feb. 14, 1952.

Louis Vaira, of Pittsburgh, Pa. for plaintiff.

William H. Eckert, John G. Buchanan, Jr., Smith, Buchanan & Ingersoll, of Pittsburgh, Pa., for defendant.

BURNS, District Judge.

As I understand the law of Pennsylvania, the beneficiary of a life insurance policy makes out a prima facie case for recovery, when the beneficiary proves the contract of insurance, the payment of all premiums up to the time of death, and the death of the assured; and the burden thereafter shifts to the insurance company to prove (1) that material representations made by the assured were false, (2) that the assured knew they were false when he made them or otherwise acted in bad faith in making them, and (3) that the insurance company relied in good faith upon those misrepresentations in issuing the policy.[1] Set against this background, the facts of the case at bar may be briefly reexamined.

On March 26, 1947, Edward Landau ("decedent") applied for a $5,000 life insurance policy with defendant. Plaintiff was designated as beneficiary. Decedent applied for an additional $3,000 coverage on April 8, 1947. Policies incorporating the applications were issued, respectively, on April 2 and April 11, 1947. Decedent died about sixteen months later, on August 4, 1948. Both policies contained a two-year incontestability provision.

Both policies provided that all statements made on behalf of decedent were to be construed, in the absence of fraud, as representations, and not as warranties.[2] Beyond question, several of decedent's statements, as recorded by the medical examiner, were contrary to fact and were as to material matters, such as the answer "none" to the request that he name every physician he had consulted for any purpose in the last five years, the answer "no" to the question "Have you ever been in a hospital * * * for observation or treatment, or other medical purpose?" and the reply "no" to the question "Have you been on a special or restricted diet within a year?" Accordingly, the jury was instructed that the application did contain incorrect statements by decedent on matters material to the risk, and the attention of the jury was directed to the remaining questions, viz., whether decedent's misstatements were made in good faith and whether defendant relied upon them; for defendant, to prevail, had to prove those contentions as well.

Review of the record in this case persuades me that a jury question did exist on the issue of reliance. It is noted that the application form, which was available to the jury in its deliberations, includes the printed recital that all the statements

1. Pennsylvania decisions not infrequently have reproduced this statement from Evans v. Penn Mutual Life Insurance Co., 1936, 322 Pa. 547, 555–556, 186 A. 133, 139–140: "Ordinarily the question of the truth or falsity of the answers and whether or not they were given by insured in good faith is for the jury. Where it affirmatively appears, from sufficient documentary evidence, that the policy was issued in reliance on false and fraudulent statements, made by or on behalf of the insured, as where false answers are shown to have been given by insured under such circumstances that he must have been aware of their falsity, the court may direct a verdict or enter judgment for the insurer. * * *

Proofs of death, however, as well as hospital records, may be contradicted or explained, and the disputed issues thus raised are for the consideration of the jury. * * * But in any case, the questions whether or not the answers were false and whether or not they were given by insured in good faith are questions of fact, and their determination must be left in the jury's hands whenever the evidence concerning them is conflicting, or whenever the burden of proving them is carried by oral testimony, even though such testimony is uncontradicted."

2. The distinction between representations and warranties is discussed in Evans v. Penn Mutual L. Ins. Co., 322 Pa. at pp. 551–553, 186 A. at pp. 137–138.

and answers, including those made to the medical examiner, "are made to induce the Company to issue the policy and are true." Also, one of the three medical directors of defendant did testify that, in acting upon applications for life insurance, defendant relied upon the answers to the questions in the medical portion of the application "as being true statements of fact;" and, further, that medical director testified that, had certain answers been entered upon this application, defendant would not have issued the policies or would have made inquiries which would have led to rejection of the applications.

It may be that, if nothing else relevant to the issue of reliance had been offered, these factors could have been taken as establishing the fact of reliance. I believe that the testimony and exhibits in this case, however, did raise a jury question as to that issue. The medical director also testified that defendant "certainly" depended upon the certification of an agent, and that defendant depended "a lot" on its medical examiners, who were expected to "find things that are normal * * * and apparent." The significance of that reliance must be weighed. The agent who obtained decedent's application for insurance filled out a form, on the back of the March 26, 1947, application. On that form, designated as "Agent's Certification", the agent noted (by checking blank boxes and inserting the figure in the space provided) that he knew the insured intimately for thirty years, and that he had no unfavorable information regarding the insured's health.[3, 4] Also, this agent had written several policies on decedent's life in the past; prior to 1927, a $20,000 policy;[5] a $2,000 policy in 1927; a $3,000 policy in 1928; a $2,000 policy in 1930; and a $3,000 policy in 1931.

Moreover, the question of reliance need not be limited to the statements made by an experienced agent.[6] As part of his application, decedent appeared personally before a medical examiner of defendant and, in addition to furnishing the answers which defendant here attacks as fraudulent, submitted himself to a physical examination. The medical examiner recorded decedent's general appearance as "healthy"; entered "good" under "Remarks (as to general, physical and mental vigor, etc.)"; found no sugar in his chemical urinalysis; answered "no" to the questions whether there was any evidence or history of past or present disease, injury or functional disturbance of the brain,[7] bones, or skin; wrote "yes" to the question whether he was satisfied, after reviewing the answers recorded in the statements to him and in his report, that every question had been answered completely; and checked "no" to whether he knew anything in connection with the insured's physical condition, family history or past health not already recorded which would affect his insurability. On the other hand, a physician of note—and the only person who was at the time a practising physician and who had treated decedent to testify at the trial—told the jury that, on March 5, 1947, only three weeks before decedent made the first of the two applications here involved, the physical appearance of decedent "was very striking and very abnormal to one who understands the kind of disease that he had", that decedent was "a true acromegalic", which meant that "the entire skeleton takes on a

---

3. The "Agent's Certification" was not reproduced in the policies issued to decedent.

4. Although the agent testified that he saw decedent only two or three times per year, he also testified that he had been insurance counsellor, for about twenty-five years, for the firm which decedent and decedent's brother operated.

5. This policy insured both decedent and his brother. It was later split into two $10,000.00 policies. It was the only policy issued by defendant, other than those here in controversy, which was still in effect at the time of decedent's death.

6. Neither the medical director of defendant nor any other witness testified to having reviewed the particular applications with which this Court is concerned.

7. Webster's New International Dictionary, Second Edition, defines the pituitary gland as "a small, oval, reddish-gray vascular body attached to the infundibulum of the brain and occupying the sella turcica".

lateral growth", which in decedent's case was evident as a large head, an extremely large lower jaw which protruded forward, "like in the Neanderthal man"; that any medical man, if he was alert, would see that disease immediately; that decedent's was "a very much distorted face", with "a good deal of discoloration"; that the shape of decedent's head had changed over the years, as he grew older; and that he was in the later stages of the disease. Furthermore, the intern at the hospital at that time, appearing as a witness for defendant, testified that it was his "observation", from looking at decedent, that decedent was suffering from acromegaly. There is no suggestion in the record before me that decedent was even cognizant of, much less responsible for, the apparent deficiencies and inaccuracies of the medical examiner, whose report does show affirmatively that neither the beneficiary nor the agent was present while decedent gave his statements to the examiner. In the light of this testimony, I believe defendant cannot complain of an instruction which was, perhaps, more favorable than that to which defendant was entitled; for the jury was charged that there is a presumption that defendant does rely upon material facts stated by applicants for insurance; and the jury was asked to decide whether plaintiff had proved that defendant had relied upon the representations of others, rather than whether defendant had proved reliance upon decedent's statements.

█ The extract quoted in footnote 1, *supra*, from Evans v. Penn Mutual Life Ins. Co., 1936, 322 Pa. 547, 186 A. 133, has been cited and quoted on numerous occasions. If the phrase "in reliance on false and fraudulent statements" is not to be honored in the breach, it must mean that, when the issue of reliance is squarely posed as it seems to me to have been in this case, the proper function of the Court is to hold that "the credibility of witnesses and the resolution of disputed questions of fact are within the exclusive province of the jury. The problem of proof in insurance cases is not different from what it is in other cases." Evans v. Penn Mut. Life Ins. Co., 322 Pa. at page 561, 186 A. at page 142.[8] This conclusion would appear to be in accord with the "very clear and unmistakable trend toward broadening an insured's right of recovery" in recent Pennsylvania cases. Evans v. Penn Mutual Life Ins. Co., 322 Pa. at page 552, 186 A. at page 137.

I find it unnecessary, therefore, to decide the close question whether the inaccurate statements made by decedent in his application were such as to constitute bad faith as a matter of law.

█ Defendant has also moved for a new trial. The answer filed by defendant had stated that decedent had consulted several other doctors; so plaintiff was permitted to testify that she had contacted those doctors and ascertained that decedent had not consulted them. This evidence seems to me not immaterial to the issue of good faith. In any event, I believe the admission of that testimony was not prejudicial error. Also, defendant objects to the form given the jury for the recording of its verdict. I believe that the form suggested by defendant could have served only to confuse the real issue, and that the form which the jury utilized was adequate and fair.

---

8. In Burton v. Pacific Mut. Life Ins. Co., 1951, 368 Pa. 613, 84 A.2d 310, 313, the Supreme Court of Pennsylvania described as "accurate and complete" a charge which reads in part as follows: "If everything that he honestly knew or observed was given and the Company accepted it and relied on it, the fact alone that they were false would not prevent his recovery."