## LANDAU v. MUTUAL LIFE INS. CO. OF NEW YORK.

### No. 10734.

United States Court of Appeals
Third Circuit.

Argued Oct. 10, 1952.

Decided Oct. 28, 1952.

William H. Eckert, Pittsburgh, Pa. (John G. Buchanan, Jr., Smith, Buchanan, Ingeroll, Rodewald & Eckert, Pittsburgh, Pa., Haughton Bell, New York City, on the brief), for appellant.

Louis Vaira, Pittsburgh, Pa., for appellee.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

The issue is whether, in a suit brought upon two life insurance policies, the District Court erred in permitting the case to go to the jury.

The plaintiff brought suit to recover the face amount of two policies of life insurance issued by the defendant on the life of her husband, Edward Landau, who died August 4, 1948. The insurance company defended on the ground that the insured had misrepresented the state of his health by giving false answers in the medical part of his application for insurance. At the close of the evidence the defendant moved for a directed verdict and binding instructions to the jury that the plaintiff was entitled only to recover premiums paid upon the policies in suit, with interest. The motion was denied and the case went to the jury which returned a verdict for the full amount of the policies. Thereafter, defendant moved that the verdict and judgment thereon be set aside and that judgment be entered in accordance with its motion for directed verdict. The motion was denied, 102 F.Supp. 810, and defendant appealed.[1]

The testimony disclosed that the insured, on March 25, 1947, made application to the defendant for a $5,000 life insurance policy, naming the plaintiff as his beneficiary. The policy was delivered on April 8, 1947. On

---

[1] The defendant also moved for a new trial on the ground of error with respect to the admission of certain testimony. The motion was denied.

that date the insured applied for another policy of $3,000 naming the plaintiff as his beneficiary. That policy was issued April 11, 1947. The application for the second policy was based on the same medical examination made in connection with the first policy and incorporated the application for the latter.

The insured at the time he made the applications was 53 years old. He had been in the wholesale millinery business in Pittsburgh in partnership with his brother for a number of years.

The March 25, 1947 application for insurance contained, inter alia, the following questions and answers:

"5. State every illness, disease, injury and operation you have had since childhood.—T & A (tonsillectomy and adenoidectomy). No serious illness.

"6. State every physician or practitioner whom you have consulted for any purpose in the last 5 years.—None.

"7. Have you ever had an X-ray, electrocardiogram, blood test or other special laboratory test?—No.

"8. Have you ever had albumin, sugar, blood, pus or casts in the urine? —No.

"9. Have you ever been in a hospital, clinic, sanitarium or institution for observation or treatment or other medical purpose?—No."

"11. Have you been on a special or restricted diet within a year?—No."

"14(a) Have you ever had Rheumatism, Diabetes, or Syphilis?—No."

"14(d) Have you ever had heart trouble, high blood pressure, pain or pressure around the heart?—No."

"20. Have you given complete answers to all the above questions?—Yes.

\* \* \* \* \* \*

"I certify that each and all of the foregoing statements and answers were read by me and are fully and correctly recorded by the Medical Examiner. I waive for myself and anyone claiming an interest in any policy issued hereunder all provisions of law forbidding any physician or other person who has attended or examined, or who may attend or examine me, from disclosing any knowledge or information which he thereby acquired.

"Dated at \* \* \* Pittsburgh, Pa. on March 25, 1947

"Witness: Oliver E. Turner
        "Medical Examiner
    "Edward Landau
        "Signature of insured."

Both policies provided they were incontestable two years after issuance. They also provided that "This Policy has been issued in consideration of the application \* \* \*" and "All statements made by or on behalf of the insured, or by the applicant shall, in the absence of fraud, be deemed representations and not warranties \* \* \*."

Voluminous hospital records were admitted in evidence. They contained histories of his illness given by the insured to hospital personnel; course of treatment; X-ray and cardiogram studies; diagnosis and prognosis. Summarized, the histories disclosed that the insured had been admitted at the instance of his physician, Dr. Joseph E. Barach, a specialist in diabetes, following an attack of diabetic shock about three weeks prior to March 5th; that he had been under treatment by Dr. Barach for about a year for diabetes; that he had been placed on a diabetic diet and insulin treatments during that period and that the insured knew he was a diabetic. The record of treatment disclosed that insulin was administered to the insured on at least eight occasions and that on at least two occasions he himself injected the insulin into his leg.

The records further established that the insured was subjected to various laboratory tests, examinations and X-rays which led to a diagnosis of acromegaly which is admittedly a serious, incurable, progressive and fatal disease stemming from a disorder of the pituitary gland. An electrocardiogram made in the hospital revealed that the insured's heart was impaired. The final diagnosis made in the hospital record by the insured's own physician was "Diabetes Mellitus, Acromegaly, Pituitary Adenoma". It may also be noted that on one occasion the insured told the hospital physician that he

had suffered occasional pains about the heart and also that he had found pus in his urine.

The insured's physician, Dr. Barach, testified that after the insured left the hospital he prescribed restricted diet and insulin and also told him to keep testing his urine. Dr. Barach also testified that he had told the insured at the time that he had a "disease involving the pituitary gland, disease of the gland in his nervous system at the base of his brain, as result of that there was a disturbance of his sugar metabolism, and that he must keep within bounds, not to aggravate that condition." Dr. Barach did not tell the insured that he was suffering from an incurable disease.

The plaintiff at the trial relied strongly on the contention that the defendant issued the policies on the representations of its agent and medical examiner; that the latter should have been aware by reason of the insured's physical appearance that he was suffering from acromegaly, which gives to one the appearance of a Neanderthal man— large head, protruding large lower jaw, distorted features, extraordinarily thick lips and large tongue plus abnormal discoloration. She also relied on the contention that the agent for the defendant had known the insured for some thirty years and had recommended the issuance of the contested policies.

On the basis of these contentions the plaintiff urged below, as she does here, that it was a jury question whether the defendant relied upon the answers given by the insured in his application or whether it had relied upon the representations of the agent who wrote the policies and its medical examiner. She further asserts that the jury's verdict resolved the issue and that it was supported by the evidence.

The defendant in reply contends that under the Pennsylvania decisions, applicable here,[2] it is entitled to a directed verdict be-cause the documentary evidence (the hospital records) establishes that false answers were given by the insured in his application and that he knew them to be false.

The District Court in sending the case to the jury and in its opinion denying the motion for a directed verdict, took the position that it was a jury question whether or not the defendant had relied upon the representations of the insured in his application for the insurance or had relied on the representations of its agent and medical examiner.

On that score it may be noted that the record is devoid of any evidence that the defendant's agent knew of the insured's illness or hospitalization. As to the defendant's reliance upon the report of its medical examiner, it has been held in litigation of the type here involved, that a medical examiner's report " * * * had nothing to do with the issues in dispute." Glickman v. Prudential Insurance Company of America, 1942, 151 Pa.Super. 52, 55, 29 A.2d 224, 226.[3]

The plaintiff has cited the Pennsylvania Act of July 19, 1935, P.L.1319, 40 P.S. § 511a, in support of her contention that defendant is estopped by reason of the favorable report of its medical examiner and its asserted reliance thereon. That Act, however, is not applicable in the instant case, under the Pennslvania decisions. Schware v. Home Life Insurance Company of America, 1939, 134 Pa.Super. 53, 3 A.2d 949. Referring to the Act, the Court there stated, in 134 Pa.Super. at pages 61, 62, 3 A.2d at page 952:

"It has no effect, where such medical report or agent's declaration or certificate was procured by or through the fraud, deceit or misrepresentations of, or on behalf of, the insured; that is, where such representation was knowingly false."

2. Croll v. John Hancock Mutual Life Insurance Co., 3 Cir., 1952, 198 F.2d 562, 564.

3. The plaintiff also cited 29 Am.Jur.—Insurance, p. 632, Section 831 in support of her contention with respect to the medical examiner's report. However, the section referred to expressly provides that where the medical examiner " * * * was purposely misled by the applicant * * * " an insurance company is not bound by the act of its medical examiner in reporting an applicant to be a fit subject for insurance.

Upon consideration of the testimony we are of the opinion that the District Court erred in denying the defendant's motion for a directed verdict limiting plaintiff's recovery to the premiums paid upon the policies in suit, with interest.

The hospital records conclusively established that the insured had been suffering from diabetes for at least a year before he applied for issuance of the policies here involved; he had been under medical treatment and on a restricted diet during that period and he knew that he was a diabetic; he had undergone hospitalization for an eight-day period just twelve days before he applied for insurance; he had been treated in the hospital for diabetes and other serious ailments and he had been X-rayed and had cardiograms taken. The testimony of his own doctor established that when he left the hospital he was told he was suffering from a disease involving the pituitary gland at the base of his brain, with a resultant disturbance of his sugar metabolism.

■ Under the evidence referred to it was clearly the duty of the District Court to direct a verdict as we held in Croll v. John Hancock Mutual Life Insurance Co., 3 Cir., 1952, 198 F.2d 562. Our ruling there is completely dispositive here. As there stated at page 564 of 198 F.2d "This was not an instance in which an applicant may have overlooked comparatively minor illnesses. * * * No juror should be asked to believe that decedent at the time he made his application may have forgotten his chest pains or the electrocardiogram taken in the hospital or [his] many visits to his physician during a relatively short period of time." [4] The documentary evidence and testimony of the

insured's own physician affirmatively established that the policies were issued in reliance on false and fraudulent statements made by the insured in his application under such circumstances that he must have been aware of their falsity and acted in bad faith in making them. Evans v. Penn Mutual Life Insurance Co., 1936, 322 Pa. 547, 560, 186 A. 133. There was no conflict in the evidence either as to the falsity of the representations or as to the knowledge or bad faith of the insured so as to require submission of the issue to the jury. Burton v. Pacific Mut. Life Ins. Co., 1938, 368 Pa. 613, 615, 84 A.2d 310; Adams v. Metropolitan Life Insurance Company, 1936, 322 Pa. 564, 186 A. 144.

For the reasons stated the Order of the District Court will be reversed and the cause remanded with instructions to proceed in accordance with this opinion.

[4] The writer of this opinion dissented in Croll v. John Hancock Mutual Life Insurance Co., supra on the ground that there was a conflict in the evidence as to the knowledge or bad faith of the insured and that consequently a jury question existed. In the Croll case the plaintiff offered testimony designed to establish that the insured was unaware of the existence of any serious ailment and consequently acted in good faith. His physician testified that he never told him he

was suffering from a heart condition or any serious illness and permitted him to engage in arduous physical tasks in the course of his daily occupation as a gasoline service station operator. In the instant case the insured's physician told him he was suffering from a condition which the insured must have realized was serious and furthermore he knew he was suffering from diabetes and had been under treatment for it for at least a year.